**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  O2 MICRO INTERNATIONAL LIMITED,
    a Cayman Islands corporation,            Nos.
                                             C 00-4071 CW (EDL)
12          Plaintiff,                       (consolidated with
                                             C 01-3995 CW)
13      v.
                                             ORDER DENYING O2
14  MONOLITHIC POWER SYSTEMS, INC.,          MICRO'S MOTION FOR
    a California corporation, and DOES 1     PERMANENT
15  through 10,                              INJUNCTION;
                                             GRANTING IN PART
16          Defendant.                       AND DENYING IN
    _____      PART MPS' RENEWED
17  MONOLITHIC POWER SYSTEMS, INC.,          MOTION FOR
                                             JUDGMENT AS A
18  a California corporation,                MATTER OF LAW ON
                                             CERTAIN ISSUES;
19          Counterclaimant,                 AND ADDRESSING
                                             OTHER ISSUES;
20      v.                                   FINDINGS OF FACT
                                             AND CONCLUSIONS OF
21  O2 MICRO INTERNATIONAL LIMITED,          LAW AFTER BENCH
    a Cayman Islands corporation, and        TRIAL
22  O2 MICRO, INC., a California
    corporation,
23
            Counterdefendants.
24  _____/

25

26      Plaintiff and Counterdefendant O2 Micro International Limited

27  and Counterdefendant O2 Micro, Inc. (collectively, O2 Micro) move

28  for a permanent injunction and seek a finding of inequitable

conduct and a finding that the case is exceptional under Title 35 U.S.C. section 285.  O2 Micro further seeks, under the California Uniform Trade Secrets Act, exemplary damages, an award of a reasonable royalty and attorneys' fees.  Defendant and Counterclaimant Monolithic Power Systems, Inc. (MPS) opposes these requests.

MPS renews, pursuant to Federal Rule of Civil Procedure 50(b), its motion for judgment as a matter of law on issues related to O2 Micro's requests.  MPS argues that neither the jury's unjust enrichment damages award nor the underlying finding, that MPS used the trade secrets, is supported by the evidence.  O2 Micro opposes the motion on procedural and substantive grounds.  In a separately filed motion, MPS further requests that, as to the patent issues, the Court treat the jury verdict as advisory.  O2 Micro also opposes that motion.

The motions for injunctive relief and exemplary damages and for judgment as a matter of law were heard on September 9, 2005.  MPS' motion requesting that the jury verdict, in part, be treated as advisory was submitted on the papers.  On September 20, 2005, the Court heard additional oral testimony regarding inequitable conduct and reasonable royalty issues.  Paul Meyer, O2 Micro's damages expert, and James Moyer, one of the inventors of the patents at issue, testified.  Having considered all of the papers filed by the parties, oral argument on the motions and evidence presented, the Court finds that O2 Micro is not entitled to an injunction.  The Court denies MPS' motion for judgment as a matter of law with respect to use, but grants MPS judgment as a matter of

law with respect to the unjust enrichment damages award.  The Court grants O2 Micro a reasonable royalty and exemplary damages, but denies O2 Micro's request for UTSA attorneys' fees.  The Court finds and concludes that MPS did not engage in inequitable conduct. O2 Micro has failed to prove by clear and convincing evidence that the article in question was material and that MPS acted with intent to deceive.  The Court also finds that this patent case is not extraordinary and thus that O2 Micro is not entitled to attorneys' fees.  The Court denies MPS' request that the Court treat the jury verdict regarding patent issues as advisory.

BACKGROUND

In November, 2000, O2 Micro brought suit against MPS for a declaratory judgment that MPS' U.S. Patent Nos. 6,144,814, Apparatus for Controlling a Discharge Lamp in a Backlighted Display (the '814 patent), and 6,316,881, Method and Apparatus for Controlling a Discharge Lamp in a Backlighted Display (the '881 patent), were invalid and not infringed.  The '881 patent, filed on March 17, 2000, and issued on November 13, 2001, is a continuation of the '814 patent, filed on December 11, 1998, and issued on September 5, 2000.  The patents relate to methods and apparatuses for supplying electrical power for driving a discharge lamp, such as a cold cathode fluorescent lamp (CCFL) used to backlight a liquid crystal display (LCD) panel.  The claimed methods and apparatuses control the supply of power to the CCFL by controlling the alternating current (AC) signal that is applied to the CCFL from a range of direct current (DC) signals.

MPS asserted counterclaims against O2 Micro for infringement

3

of its patents.  O2 Micro later filed a new lawsuit against MPS, alleging misappropriation of its trade secrets.  The Court consolidated the two cases.  Following a motion to dismiss, claim construction, motions for summary judgment and discovery disputes, the case proceeded to a jury trial on June 27, 2005.  The equitable issues were reserved for trial to the Court.

On July 18, 2005, after an eleven-day trial, the jury returned a verdict.  The jury found that O2 Micro's Trade Secret Claims 1 through 11 were trade secrets and that Trade Secrets 1 and 8 through 11 were misappropriated by MPS, who the jury determined acted willfully and with malice.  The jury awarded O2 Micro $12 million in unjust enrichment damages for MPS' misappropriation of Trade Secret Claim 1, the transformer-related claim, but awarded no damages for MPS' misappropriation of Trade Secrets 8 through 11. The jury further found that O2 Micro did not infringe the asserted claims of MPS' '814 patent or its '881 patent and that all asserted claims were invalid as anticipated by the prior art.

DISCUSSION

I.  Injunction

California Civil Code section 3426.2(a) provides, "Actual or threatened misappropriation may be enjoined."  O2 Micro acknowledges that an injunction based on a trade secret no longer secret is generally not permitted under the UTSA.  But an "injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."  Cal. Civ. Code § 3426.2(a). Thus, O2 Micro requests that the Court order a lead-time or "head

4

start" injunction to eliminate MPS' commercial advantage, and O2 Micro's commercial disadvantage, resulting from the head start MPS obtained through its misappropriation.  See Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991) (noting that a trade secret injunction "seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained").  O2 Micro requests a "production injunction," or, in the alternative, an "use injunction."

O2 Micro's requested production injunction would prohibit MPS from "manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, marketing, importing, promoting, disclosing or using" numerous listed MPS products and "any other product that satisfies sufficient requirements to practice Trade Secret 1, and any boards containing those products."  O2 Micro's [Proposed] Order Re Motion for Perm. Inj. at 2:9-15.  But the two cases it cites, General Electric Co. v. Sung, 843 F. Supp. 776, 779-780 (D. Mass. 1994), and Viscofan, S.A. v. U.S. International Trade Commission, 787 F.2d 544 (Fed. Cir. 1986), do not support imposing such an extreme injunction in this case.  As noted by the court in Viscofan, normally the misappropriator is only barred from using the particular secrets he or she has taken.  787 F.2d at 449.  Courts impose production injunctions only in circumstances "where the misappropriated trade secrets are 'inextricably connected' to the defendant's manufacture of the product" and thus a "use injunction is ineffective because the misappropriation cannot be relied upon to 'unlearn' or abandon the misappropriated technology."  General

5

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Elec. Co., 843 F. Supp. at 780.

2        O2 Micro provides no evidence of "inextricable connection"

3    that would render a use injunction ineffective.  Nonetheless, it

4    argues that a use injunction would be ineffective in eliminating

5    the competitive advantage MPS gained by its misappropriation

6    because only a production injunction can restore the playing field

7    to a fully level position.  But O2 Micro fails to show any

8    competitive advantage, much less any advantage that can be

9    eliminated only through the drastic measure of a production

10   injunction.  The only evidence O2 Micro cites to support the

11   alleged competitive advantage that MPS gained at O2 Micro's expense

12   is testimony that MPS was able to fix its problem in 2000, which

13   allegedly resulted in O2 Micro losing hundreds of thousands of

14   potential sales for its OZ960 product.  But this evidence does not

15   prove that O2 Micro lost significant business opportunities because

16   of MPS' misappropriation.  Nor does it prove that MPS gained a

17   competitive advantage through its misappropriation.  The Court

18   finds that O2 Micro provides no evidence to justify a production

19   injunction.

20       O2 Micro's requested use injunction would prohibit MPS from

21   using any aspect of Trade Secret 1 for a six-month period from the

22   date the injunction is entered; O2 Micro claims that it took O2

23   Micro approximately six months to develop the trade secret.  But,

24   as noted by MPS, and not denied by O2 Micro, the information at

25   issue has long been non-secret.  In response, O2 Micro argues that

26   MPS' six-month head start continues to this day and has not been

27   eliminated by the passage of time.  Again, however, O2 Micro

28                                      6

United States District Court

For the Northern District of California

provides no facts to support its argument that it continues to be prejudiced by MPS' misappropriation.

Because the trade secrets at issue have been disclosed and there is no evidence that a commercial advantage derived from the misappropriation exists, the Court denies O2 Micro's motion for an use injunction.

II.   Judgment as a Matter of Law

A motion for judgment as a matter of law after the verdict renews the moving party's prior Rule 50(a) motion for judgment as a matter of law at the close of all the evidence.  Fed. R. Civ. P. 50(b).  Judgment as a matter of law after the verdict may be granted only when the evidence and its inferences, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion as to the verdict.  Where there is sufficient conflicting evidence, or if reasonable minds could differ over the verdict, judgment after the verdict is improper.  See, e.g., Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 775 (9th Cir. 1990); Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 181 (9th Cir. 1989); Peterson v. Kennedy, 771 F.2d 1244, 1252 (9th Cir. 1985); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1387 (9th Cir. 1984).

A.   Timeliness

Before reaching the substance of MPS' motion, O2 Micro argues that MPS' renewed motion for judgment as a matter of law is untimely under Federal Rule of Civil Procedure 50(b).  See Fed. R. Civ. P. 50(b) ("movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry

7

of judgment").  O2 Micro focuses on the phrase: "no later than 10 days after entry of judgment," arguing that Rule 50(b) authorizes only post-judgment motions for judgment as a matter of law.

MPS correctly notes, however, that Rule 50(b) does not bar MPS from filing its renewed motion at this time.  O2 Micro points to no other rule or case law that prohibits MPS from filing its motion for judgment as a matter of law before judgment.

O2 Micro further argues that this motion violates the Court's instruction that JMOL matters should be addressed "separate and apart" from equitable matters still pending, and only after the equitable matters were decided.  As correctly noted by MPS, however, the issues presented in this motion and O2 Micro's motion for exemplary damages and injunctive relief are intertwined.  The Court considers the issues together.

B.   Waiver

O2 Micro further argues that the Court should not consider MPS' motion on its merits because MPS waived its rights to renew its motion for judgment as a matter of law.  O2 Micro cites Ninth Circuit precedent holding that the requirement to move for a judgment as a matter of law at the close of evidence is strictly construed in this circuit; "substantial compliance is not enough." Janes v. Wal-Mart Stores Inc., 279 F.3d 883, 887 (9th Cir. 2002).

MPS does not deny that it did not make its motion at the close of all the evidence.  Instead, MPS notes that, like other circuits, the Ninth Circuit makes an exception to this requirement in cases where an earlier motion has been taken under advisement by the trial judge.  Farley Trans. Co., Inc. v. Santa Fe Trail Trans. Co.,

United States District Court

For the Northern District of California

786 F.2d 1342, 1346 (9th Cir. 1986).[1]  As explained by the court:

> The trial court's reservation of a ruling on a motion for a directed verdict made before the close of all the evidence maintains the motion as a continuing objection to the sufficiency of the evidence, provides notice to the opposing party of the challenge, and constitutes a judicial indication that renewal of the motion is not necessary to preserve the moving party's rights.

Id. at 1346-47.  Here, MPS filed its motion for judgment as a matter of law on July 11, 2005, before the close of all the evidence on July 14, 2005.  Therefore, MPS did not waive its right to bring this motion.

MPS also notes that the Court instructed the parties not to make oral motions for judgment as a matter of law before the jury and that when MPS and O2 Micro rested their cases the jury was present.  See Trial Tr. 1954:3-15.[2]  MPS argues that the Court should not penalize it for following the Court's instructions and filing its motion for judgment as a matter of law the same day as the close of all the evidence.[3]  The Court will not.

C.   Use

MPS argues that O2 Micro failed to present any evidence that MPS put any of its claimed trade secrets to commercial use.  MPS contends that, because O2 Micro failed to prove use, O2 Micro

_____

[1] In Patel v. Penman, 103 F.3d 868, 878 (9th Cir. 1996), the court noted that Rule 50(b) has been amended since Farley was decided.  The amendments, however, do not appear to have changed the Rule as it applies in this situation.  Id.

[2] Unless otherwise specified, citations to the trial transcripts refer to the jury trial.

[3] MPS points out that O2 Micro did not renew its judgment as a matter of law in open court before the jury; O2 Micro filed its JMOL motion after MPS did.

United States District Court

For the Northern District of California

cannot recover damages or injunctive relief.

MPS illustrates weaknesses in O2 Micro's trade secrets case. But a judgment as a matter of law is not about weaknesses, or even gaps, in a party's case. As noted by O2 Micro, MPS does not address, or even acknowledge, the high legal standard this Court must apply to this motion. In the Ninth Circuit, the standard for judgment as a matter of law, like the standard for summary judgment, requires that the Court find that reasonable minds could come to only one conclusion with respect to the elements of the verdict. See, e.g., Kendall Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042 (9th Cir. 1998). O2 Micro presented sufficient conflicting evidence, inferential evidence, and questions regarding credibility that a reasonable juror could have concluded that MPS used the trade secrets at issue.

1.  Definition of Use

Before discussing the evidence presented at trial, the parties dispute the definition of "use." The parties agree that use does not mean mere possession of a trade secret or mere internal discussion within the company of a trade secret; the parties disagree over whether internal experimentation can constitute use. Based on the California and federal cases presented by the parties, the Court concludes that internal experimentation with trade secret information not resulting in a market product can constitute use. In AT&T Communications v. Pacific Bell, 1998 U.S. Dist. LEXIS 13459, at *8 (N.D. Cal. 1998), the court rejected the defendant's argument that, for misappropriation and use to occur under the California UTSA, the trade secret information must be sold to the

**United States District Court**
For the Northern District of California

plaintiff's competitors or used to compete directly.  As recently stated in PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (2000), "Employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use."

2.   Trade Secret 1, the Transformer Claim

MPS argues that Trade Secret 1 consists of an O2 Micro chip along with "the combination of seven Sumida transformer features." If by "combination" MPS means a combination of all seven features, however, it is wrong.  O2 Micro correctly notes that, according to the definition given to the jurors, Trade Secret 1 consists of various permutations of those seven features.  See List of O2 Micro's Trade Secret Claims ("1. O2 Micro's design and selection of a transformer that has one or more of the following characteristics with an inverter model that includes a OZ960, OZ961, OZ969A, OZ970 or OZ9RZ controller . . .") (emphasis added).  Thus, each of items d though g may be satisfied if in combination with "one or more" of items a through c.  Id.

To show use, MPS contends, O2 Micro would have to prove that MPS either used an O2 Micro chip or altered an MPS chip to incorporate O2 Micro chip features and then (1) used a transformer with the seven allegedly secret features with such a chip on a demo board shown to at least one customer; (2) recommended that an MPS customer use such a chip along with a transformer with the seven features; (3) recommended that an end customer ask the customer's own suppliers to use such a chip along with a transformer with the

11

United States District Court

For the Northern District of California

1  seven features; or (4) recommended that a transformer manufacturer

2  alter the manufacturer's own transformer design to use the seven

3  features and that the manufacturer then try to sell that

4  transformer alongside such a chip.

5      O2 Micro does not argue that it showed any of these four

6  scenarios.  Instead, it correctly notes that MPS' definitions of

7  "use" and Trade Secret 1 are overly restrictive, as discussed

8  above.  To show use in the first scenario, O2 Micro is not required

9  to prove that MPS showed a demo board to at least one customer.

10 Use for research and development constitutes use.  And, not all

11 seven features, or characteristics, must be present at the same

12 time.

13     The Court's finding that the evidence presented at trial was

14 sufficient to permit a rational jury to infer that MPS used, and

15 thus misappropriated, Trade Secret 1, is based on the following.

16 In September, 2000, an MPS vice-president forwarded an OZ960 data

17 sheet to MPS engineers James Moyer and Paul Ueunten; the data sheet

18 was labeled confidential.  Trial Exs. 214, 215; Trial Tr. 1338,

19 1339-1440.  Mr. Ueunten testified that after looking at the

20 transformer network on the data sheet he concluded that, other than

21 an extra capacitor, O2 Micro's transformer network, including the

22 transformer, could be used with a MPS chip.  Trial Tr. 1340:3-7.

23 Approximately a month later, Mr. Ueunten compared the waveforms

24 from the confidential OZ960 data sheet with waveforms from an

25 O2 Micro's OZ960 demo board provided by an Ambit employee.  Trial

26 Ex. 222; Trial Tr. 1340:12-1341:5.  Mr. Ueunten concluded that the

27 transformer "must be the key to efficiency" of the OZ960 and asked

28

**United States District Court**
For the Northern District of California

if MPS could "get a hold of the inventor and/or its transformer." Trial Ex. 222; Trial Tr. 1341:14-19.  Soon, the "general consensus" at MPS was that "MPS' transformer design needs a thorough review and is likely the quickest way to improve our circuit efficiency." Trial Ex. 125; Trial Tr. 525:3-12.

MPS obtained another OZ960 demo board in October, 2000 from Sumida.  Although MPS contends that this board was a production board and not a demo board, Dr. Lin, O2 Micro's Executive Vice President in Engineering, testified that the board MPS obtained and analyzed was a demo board.  Trial Tr. 1882:16-1883:25.  Mr. Ueunten analyzed the transformer on this board.  Trial Tr. 1341-32.  And that same month, MPS started listing on its bills of materials for its customers the model of the transformer that O2 Micro was using. MPS' Mr. Moyer testified that this list was not "a recommendation necessarily."  Trial Ex. 4189; Trial Tr. 663:5-19 (emphasis added). In June, 2002, MPS still listed that model transformer in its bills of materials it gave to its customers.  Trial Ex. 4193.

In November, 2000, Mr. Moyer analyzed the demo board that MPS obtained from Sumida, and sent an e-mail noting the "dramatic" difference between the transformers on the O2 Micro and MPS boards. Trial Exs. 227, 249.  Simon Tsai was instructed to perform further analysis on the OZ960 module, such as determining wire size and secondary bays.  Trial Exs. 227, 249; Trial Tr. 656-57, 659:10-660:10.  Mr. Tsai began "experimenting" and changing the thickness of the wires, altering the turns ratio in the MPS transformer's windings and filling in the bays on the transformer's bobbins. Trial Tr. 1507:17-25; 1509:1-7.  Mr. Tsai testified that he

13

United States District Court

For the Northern District of California

"experimented" with MPS' transformer, aiming to improve the performance of the transformer, in response to customer complaints and Mr. Moyer's instructions. Trial Tr. 1508:11-25; 1509:12-16; 1510:6-16. From this evidence, the jury reasonably could have concluded that MPS engaged in more than "internal discussions" of the transformer design; the jury reasonably could have concluded that MPS used the O2 Micro trade secret to improve the transformers used with MPS controllers, or, at the very least, that MPS used the trade secret for research or development purposes.

As noted repeatedly by MPS, however, use of the Sumida transformer by itself does not show use of Trade Secret 1. Any violation would have to include an O2 Micro controller, as well as a showing of "one or more" of the seven characteristics. MPS witness Kip Brown, however, testified that when testing an MPS demo board, he found that the board included a transformer incorporating six of the seven characteristics from O2 Micro's Trade Secret 1. Trial Tr. 1387:12-1390:21; 1411:8-14. Mr. Brown testified that those six characteristics could not have been trade secrets because MPS knew about them. Trial Tr. 1391:19-25. Thus, as O2 Micro noted at trial, the question is whether the board examined by Mr. Brown was created before or after MPS got access to the O2 Micro boards. Trial Tr. 1411:15-17. MPS argues that this board contained chips from early 2000, which was before it received O2 Micro's data sheet or O2 Micro's demo boards. But, as O2 Micro correctly notes, the jury reasonably could have believed Mr. Brown's testimony as to finding six out of the seven characteristics and disbelieved Mr. Brown's testimony as to whether

14

United States District Court

For the Northern District of California

the six characteristics were secret; the jury reasonably could have believed that the demo board examined by Mr. Brown was made after MPS acquired O2 Micro's data sheet and demo board.  Mr. Brown admitted that his conclusion that the six characteristics he found were not secrets was based on information he received from MPS employee Mr. Ueunten.  Trial Tr. 1411:24-1412:1; 1412:15-18; 1414:24-1415:8.  His belief that MPS' board was created before MPS got access to O2 Micro's board was based on information received from MPS employees, particularly Mr. Ueunten, and dates that were handwritten by Mr. Ueunten.  Trial Tr. 1411:24-1412:18.  The jury reasonably could have disbelieved Mr. Ueunten's testimony, and found him not to be credible, because if MPS had already arrived at the same design solution as O2 Micro had, this likely would have been reflected in MPS' e-mails presented to the jury.  See Trial Exs. 227, 249.  It was not.  Instead, the e-mails discuss the "dramatic" differences between MPS' transformer and O2 Micro's transformer.  Id.

MPS argues that even if the six characteristics are present, O2 Micro is trying to elude Trade Secret 1's required connection with an O2 Micro's chip.  The jury, however, reasonably could have combined the testimony of Mr. Brown and other witnesses to infer that the MPS demo board that employed six of the seven characteristics was based on MPS' analysis of the demo boards with O2 Micro chips.

MPS also argues that O2 Micro admitted that various of the transformer characteristics, such as wire size, were not secret. The jury, however, could have reasonably concluded that the

combination of the different characteristics was the trade secret. The jury was instructed that:

> Combinations of public information from a variety of different sources when combined in a novel way can be a trade secret.  It does not matter if a portion of the trade secret is generally known, or even that every individual portion of the trade secret is generally known, as long as the combination of all such information is not generally known.

Final Jury Instructions at 8:17-23.

   3. Trade Secret 8

   Trade Secret 8 relates to information about cost and configuration that is found in O2 Micro data sheets and demonstration boards.  MPS argues that O2 Micro never showed that MPS made a sale as a result of any claimed secret information relating to cost.  The jury, however, could have reasonably concluded that MPS used this confidential information, on the basis of e-mails from MPS employee Fiona Wang and testimony from MPS vice-president Maurice Sciammas.  In one e-mail, Ms. Wang, who is in charge of finance and customer service in Taiwan, stated that Mr. Tsai used O2 Micro's data sheets to determine or verify component count and solution cost information for O2 Micro.  Trial Ex. 395.  In another e-mail, Ms. Wang attached a price analysis of O2 Micro's OZ969A versus MPS solutions.  Trial Ex. 440.  Mr. Sciammas testified that this information was valuable to MPS.  Trial Tr. 867:16-868:12.  MPS asserts that this evidence does not point to any external use or disclosure.  It does not have to: research and development constitute use.

   4. Trade Secret 9

   Trade Secret 9 relates to the desirability and benefits of a

16

**United States District Court**
For the Northern District of California

controller that O2 Micro was developing.  As noted by MPS, O2 Micro's expert, Mr. Meyer, stated that he was told by O2 Micro's counsel or Dr. Lin that MPS did not practice Trade Secret 9.  Trial Tr. 1254:25-1255:10; 1256:1-6.  But that testimony is not enough for the Court to conclude that reasonable minds could have come to only the single conclusion that Trade Secret 9 was not used.  Testimony was also presented that Trade Secret 9 was used to "evaluate" whether MPS should make a similar product.  Trial Tr. 873:10-76:7.  The jury reasonably could have concluded that although MPS did not affirmatively use this trade secret in its product, as Mr. Meyer testified he was told, it did use this information as part of research and development in deciding not to enter a market in which it stood no chance of profiting.

5. Trade Secret 10

Trade Secret 10 is similar to Trade Secret 8, but relates specifically to the solution cost and configuration information for the OZ9RR part.  MPS again argues that O2 Micro never showed that MPS actually made a sale as a result of any claimed secret information relating to cost.  The jury, however, could infer that MPS used this information to compare its product with OZR99 for use in marketing a proposed new product.

6. Trade Secret 11

Trade Secret 11 relates to O2 Micro's method of using multiplexing functions in the pins of the OZ9RR inverter controllers so that one pin of the OZ9RR inverter controller may support multiple functions co-existing in an inverter application.  MPS notes that Mr. Meyer stated that he was told by O2 Micro's counsel

17

or Dr. Lin that MPS did not practice Trade Secret 11. Trial Tr. 1254:25-1255:10; 1256:1-6. But O2 Micro presented evidence from which the jury could infer that MPS used this information in implementing its own part, even though the functions that the MPS part multiplexed were different then the functions multiplexed by O2 Micro. Trial Tr. 781:18-782:16. The jury was entitled to discount Mr. Meyer's testimony and to rely upon other evidence; thus, the evidence does not point to the single conclusion that MPS did not use Trade Secret 11.

B.   Damages

MPS argues that, distinct from the question of use, the jury's $12 million unjust enrichment award for Trade Secret 1, the transformer-related trade secret, was not based upon evidence from which a reasonable jury could have made that award. MPS correctly notes that O2 Micro failed to present evidence of unjust enrichment damages that was specific to Trade Secret 1. Instead, O2 Micro's damages expert, Mr. Meyer, provided the jury with a damages calculation based on an assumption that all of the trade secrets were misappropriated. Mr. Meyer testified that MPS was unjustly enriched by approximately $16 million based on the misappropriation of all of the trade secrets. Trial Tr. 1254:5-12. The jury, however, found that only five of the eleven trade secrets were misappropriated, and that only the misappropriation of one of them resulted in MPS being unjustly enriched.

The Court warned O2 Micro of the dangers of bundling all of its alleged trade secrets damages together:

[I]t seems to me that if Meyer is saying the damages

18

**United States District Court**
For the Northern District of California

> are X dollars if they stole all our trade secrets, he
> can say that.  But if the jury finds that he only stole
> 11 of them, then his testimony would be stricken and
> you would have no testimony because there'd be no basis
> upon which a jury could decide what the damages were
> from the theft of 11 secrets when they've heard
> testimony only about what the damages are from 12
> secrets unless somehow he can say that no matter how
> many secrets are stolen, the same damages are accrued.

Transcript of Jan. 28, 2005 Pretrial Conference, 41:13-22.  In the

same pretrial conference, the Court again told O2 Micro that "you

can have that kind of damage evidence if you want to.  I'm just

warning you that if you do and you don't win on all 12 of your trade

secrets, you'll have no damages."  Id. at 43:22-25.  Then in the

Court's subsequent Pretrial Order, the Court ruled that "if O2 Micro

fails to prove at trial any of the hypotheses upon which Meyer

relies, including use, his expert testimony will be stricken as

irrelevant."  Order After Jan. 28, 2005 Pretrial Conference at

5:3-6.

Nonetheless, O2 Micro presented evidence of damages based on

misappropriation of all trade secrets, but was unable to convince

the jury that all trade secrets were misappropriated.  O2 Micro now

wrongly contends that the damages award is supported by the

evidence.

Citing Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514 (1997),

O2 Micro states that, in trade secret claims, damages need not be

calculated with absolute precision.  Damages do, however, need to

rest on a "reasonable basis."  See, e.g., Tri-Tron Int'l v. Velto,

525 F.2d 432, 436 (9th Cir. 1975); American Loan Corp. v. California

Commercial Corp., 211 Cal. App. 2d 515, 524 (1963).  Here, the Court

finds there is no reasonable basis.

**United States District Court**

For the Northern District of California

O2 Micro asserts that Dr. Lin, as an officer of O2 Micro, can testify concerning the value of O2 Micro's assets, including its trade secrets. Trial Tr. 159. O2 Micro argues that the jury therefore could have relied on Dr. Lin's testimony to determine that the value of Trade Secret 1 was seventy-five percent of the value of all asserted trade secrets, which would explain why the jury awarded $12 million in unjust enrichment damages for misappropriation of Trade Secret 1, and not the entire $16 million discussed by Mr. Meyer. This argument, however, fails: Dr. Lin never testified that Trade Secret 1 was worth seventy-five to ninety percent of the monetary value of the all other trade secrets.

When counsel for O2 Micro asked Dr. Lin what value he would put on the transformer information in comparison to the other alleged trade secrets, MPS' counsel objected as calling for expert testimony. After O2 Micro's counsel assured the Court that it was looking for "just his assessment of importance, not a dollar value," Dr. Lin responded: "Transformer could be the heart of the inverter module. If you want to quantify it, could be 80 percent, 90 percent, 75 percent? Could be up there." Trial Tr. 284: 1-12.

Dr. Lin's testimony does not provide a reasonable basis for the jury to apportion damages. He did not state that Trade Secret 1 is worth seventy-five to ninety percent of monetary value of all the trade secrets, nor can that be inferred from his testimony. Even if Dr. Lin stated that Trade Secret 1 was worth seventy-five percent of all the trade secrets, that describes only what it is worth to O2 Micro. It does not provide a reasonable basis for the jury to determine the amount that MPS was unjustly enriched based upon its

misappropriation of Trade Secret 1.

The additional testimony of other witnesses regarding the great importance of transformers also fails to provide the necessary reasonable basis for the jury to apportion unjust enrichment damages. MPS employee Mr. Shannon testified that the transformer is the "single largest component in an inverter," and that getting a good transformer design was important to MPS and its customers. That testimony, even combined with similar testimony from other witnesses, does not provide a reasonable basis for the jury to award seventy-five percent of the amount of unjust enrichment damages for all trade secrets, when it found that MPS misappropriated only five trade secrets and awarded unjust enrichment damages only for Trade Secret 1.

After the jury concluded that MPS did not misappropriate all of O2 Micro's trade secrets, Mr. Meyer's expert testimony regarding damages for misappropriation of all trade secret was useless to the jury. The jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages. Thus, the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence. The Court grants MPS' motion for judgment as a matter of law that O2 Micro failed to prove unjust enrichment damages for misappropriation of Trade Secret 1.

III. Reasonable Royalty

In light of MPS' challenge to the jury's damages award, O2 Micro requests a reasonable royalty should the Court determine that unjust enrichment was not proved. California Civil Code § 3426.3(b) ("If neither damages nor unjust enrichment caused by

21

United States District Court

For the Northern District of California

misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.").  Neither unjust enrichment nor damages have been proven and the Court will grant O2 Micro a reasonable royalty.

MPS argues that there is no basis for awarding a reasonable royalty because it did not use O2 Micro's trade secrets; if the Court does award a reasonable royalty, MPS asserts that the amount should not be greater than $128,017.03.  But the Court has already rejected MPS' argument that there was no use, and thus rejects MPS' argument that there can be no reasonable royalty because MPS did not use the trade secrets.  The Court also rejects, in part, MPS' argument that O2 Micro's reasonable royalty estimate is plagued with the same problem as its unjust enrichment damages award, _i.e._, it is based on misappropriation of all the trade secrets and not just the five found by the jury.  Mr. Meyer explained during the bench trial, and noted in his November 5, 2004 expert damages report, that he determined that the parties in a hypothetical negotiation would agree to a $900,000 paid-up reasonable royalty for any one group of trade secrets; he stated that the transformer trade secrets would be an example of a group of trade secrets.[4]

The Court has reviewed the factors relevant to a reasonable royalty determination.  See _Georgia-Pacific v. United States Plywood Corp._, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), _modified and aff'd_,

---

[4]Because the Court has not relied upon the Declaration of Paul K. Meyer in Response to MPS' Statement on Reasonable Royalty Damages in its determination of a reasonable royalty, the Court overrules O2 Micro's objections as moot.

446 F.2d 295 (2d Cir. 1971).  And the Court accepts the analysis of those factors set forth by Mr. Meyer in his explanation of the $900,000 reasonable royalty figure.

Mr. Meyer posits a "paid-up royalty," a one-time payment that allows the licensee to practice the trade secret in the future without making any more payments.  As correctly noted by MPS, the UTSA provides for a reasonable royalty "for no longer than the period of time the use could have been prohibited."  Cal. Civ. Code § 3426.3(b).  Thus, MPS argues that, because the trade secret became public six months after the hypothetical negotiation, it should only have to pay a fourth of the $900,000, which Mr. Meyer calculated based on a two-year benefit to MPS.  But a paid-up royalty, unlike a running royalty, cannot be divided.  Parties often enter into an agreement not knowing when the trade secret will become public; it is something the parties consider, and sometimes risk, during their negotiations.  Bench Trial Tr. 77:8-19; 80:17-81:14.  MPS provides no evidence that it would not have entered into this hypothetical agreement, or would have paid far less, because it knew that the trade secret would soon become public.  Nor does MPS cite a case holding that a paid-up reasonable royalty should not be imposed, or must be divided, if the trade secret becomes public shortly after the hypothetical negotiation.  In sum, the $900,000 reasonable royalty does not require MPS to pay for longer than the period of time the use could have been prohibited; instead, it requires MPS to make a one-time payment while the use was prohibited.  Therefore, the Court grants O2 Micro a reasonable royalty in the amount of $900,000.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

IV. Exemplary Damages

As noted by O2 Micro, because the jury found that MPS' misappropriations were willful and malicious, the Court has the discretion to award exemplary damages.  Cal. Civ. Code § 3246.3(c) ("If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award" of reasonable royalty, or compensatory or unjust enrichment damages).

O2 Micro argues that the maximum amount of exemplary damages should be awarded because the reprehensibility of MPS' conduct is high; the harm to O2 Micro was great; MPS' financial condition is such that enhancement of damages is appropriate; and an award of exemplary damages will punish and deter MPS from future misconduct. MPS fails to address O2 Micro's arguments directly.  Instead, MPS argues that the correct UTSA standard for determining exemplary damages follows patent law.  See UTSA § 3 Commissioners' Comment ("This provision follows federal patent law in leaving discretionary trebling to the judge.").  But, as O2 Micro correctly notes, the Commissioners' Comments only state that, as in patent law, exemplary damages are for the judge, not jury, to determine.  The comments do not state that patent decisions and standards apply to exemplary damages under the UTSA; nor do the comments support following patent law when there are California cases on point.  MPS ignores relevant California cases.  It cites a Kansas District Court trade secrets case, Biocore, Inc. v. Khosrowshahi, 2004 WL 303194 (D. Kan. Feb. 2, 2004), in which the court determined exemplary damages under a nine factor test commonly considered in patent cases, and a Ninth Circuit

case, <u>Yeti by Molly, Ltd. v. Deckers Outdoor Corp.</u>, 259 F.3d 1101 (9th Cir. 2001), that involved the Montana UTSA.  Neither case addressed the California UTSA.

Unlike MPS, O2 Micro cites California cases to support its argument that the proper factors for this Court to consider are the three announced by the California Supreme Court decades ago and reiterated by the California Supreme Court more recently in <u>Adams v. Murakami</u>, 54 Cal.3d 105 (1991).  Those factors are (1) the nature of the misconduct; (2) amount of compensatory damages; and (3) the defendant's financial condition.  <u>Neal v. Farmers Ins. Exchange</u>, 21 Cal.3d 910, 928 (1978); <u>Adams</u>, 54 Cal.3d at 111.  In <u>Cloud & Assocation, Inc. v. Mikesell</u>, 69 Cal. App. 4th 1141 (1999), the court reversed an award for punitive damages under California Civil Code section 3426.3(c) because there was no evidence of the defendant's financial condition as required by <u>Adams</u> and <u>Neal</u>. 69 Cal. App. 4th at 1151-53.  The court rejected the plaintiff's argument that under the UTSA the financial condition of the defendant is less of a concern than in other punitive damage cases, and noted that another court had previously held "the <u>Adams</u> rule applicable to a case in which the remedies of the UTSA were applied."  <u>Id</u>. at 1151 (citing <u>Vacco Ind., Inc. v. Van Den Berg</u>, 5 Cal. App. 4th 34, 46 n.11 (1992)).  Thus, in exercising its discretion the Court is guided by the three factors found in <u>Neal</u> and <u>Adams</u>.

The jury determined that MPS acted willfully and maliciously. MPS' financial condition is such that it has the ability to pay the

25

United States District Court

For the Northern District of California

1   maximum in exemplary damages: $1,800,000.[5]   See Cloud & Assoc., 69

2   Cal. App. 4th at 1152.

3      It is only the second Adams and Neal factor, compensatory

4   damages, that does not point strongly in the direction of awarding

5   the maximum possible amount in exemplary damages.   Adams, 54 Cal. 3d

6   at 110; Neal, 21 Cal. 3d at 928.   Here, the jury found no

7   compensatory damages.   O2 Micro glosses over this problem by

8   focusing, not on compensatory damages, but rather on the significant

9   harm O2 Micro suffered from MPS' misappropriation.   O2 Micro argues

10  that a significant portion of MPS' unjust enrichment was at its

11  expense and that the evidence shows that it lost significant

12  business opportunities because of MPS' misappropriation.   But the

13  evidence O2 Micro offers is unconvincing, consisting mostly of the

14  inquiries O2 Micro received from customers in September, 2000,

15  regarding its OZ960 product, which inquiries dissipated in December,

16  2000, after MPS made improvements in its transformer allegedly based

17  on its access to O2 Micro's confidential information and

18  confidential demo board.   This evidence does not prove that O2 Micro

19  lost significant business opportunities because of MPS'

20  misappropriation.   The fact remains that the jury found no

21  compensatory damages.

22

23      [5]According to MPS' 10-Q filing with the SEC for the period
    ending March 31, 2005, MPS has current assets of approximately
24  $74.6 million and current liabilities of approximately $10.5
    million.   Trial Ex. 5036.   Thus, O2 Micro states that MPS has a net
25  worth of approximately $63.9 million, or, as stated in SEC
    terminology, a "total stockholders' equity" of approximately $63.9
26  million.   Id.   MPS' recent press release states that MPS had total
    revenues of approximately $22.3 million in the three months ending
27  June 30, 2005.   Trial Ex. 5037.

28                                    26

There is no rule, however, mandating that a party show that all three factors point strongly in favor of an exemplary damage award. The decision in <u>Adams</u> focused almost exclusively on the financial condition of the defendant in reviewing whether the court abused its discretion in granting exemplary damages.  O2 Micro should not be denied exemplary damages because it fails to show compensatory damages, especially since the UTSA explicitly authorizes exemplary damages awards of not more than twice the award of a reasonable royalty or unjust enrichment damages.  Therefore, the Court determines that, based on MPS' financial condition and the jury's finding of willfulness and maliciousness, exemplary damages are appropriate.  The Court awards $1,800,000, twice the amount of the reasonable royalty.

V.   Attorneys' Fees

O2 Micro argues that because the jury found that MPS' misappropriation was willful and malicious, it is entitled to attorneys' fees under the California UTSA.  California Civil Code section 3426.4 provides, "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party." The UTSA does not define bad faith.  As noted in <u>Gemini Aluminum Corp. v. California Custom Shapes, Inc.</u>, 95 Cal. App. 4th 1249, 1261 (2002), it is generally recognized that the purpose of the statute is to deter specious misappropriation actions.  In order to be

United States District Court

For the Northern District of California

deterrable, a trade secret misappropriation claim must involve conduct more culpable than negligence; it must be "at least reckless or grossly negligent, if not intentional and willful." Stilwell Dev., Inc. v. Chen, 11 U.S.P.Q. 2d (BNA) 1328, 1330 (C.D. Cal. 1989).

But, as noted by MPS, attorneys' fees are not mandatory even if the jury finds willful and malicious misappropriation. See Cal. Civ. Code § 3426.4 ("the court may award reasonable attorney's fees") (emphasis added). MPS asserts that O2 Micro's frequent alteration of its trade secret claims weighs against a fee award. And if the Court considers a fee award, MPS requests a reciprocal award under section 3426.4 based on the fees it incurred defending the chip design claims the jury rejected (claims 2-7). O2 Micro argues that MPS' reciprocal fee request should be denied because it failed to provide proper notice and because there is no showing of bad faith on O2 Micro's part.

The Court concludes that, because of the purpose of the statute, the behavior of the parties during this litigation and the exemplary damages awarded, neither party will be awarded attorneys' fees under the California UTSA.

VI.  Patent Issues

    A.    Findings of Fact and Conclusions of Law on Inequitable
          Conduct

    O2 Micro asserts that the '814 and '881 patents are unenforceable based on MPS' inequitable conduct. Patent applicants

28

and their legal representatives have a duty to prosecute applications with candor and good faith.  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a).  O2 Micro contends that MPS breached that duty by failing to disclose an August, 1994, article by Melvin C. Cosby, Jr. and R.M. Nelms, entitled "A Resonant Inverter for Electronic Ballast Applications" (Cosby/Nelms article).  Trial Ex. 69.

A breach of the duty to prosecute patents in good faith occurs when an individual associated with filing and prosecuting a patent application fails to disclose material information with an intent to deceive.  Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 693 (Fed. Cir. 2001).  Proof of inequitable conduct entails a two-step analysis.  The court must first determine "whether the withheld references satisfy a threshold level of materiality," and next "whether the applicant's conduct satisfies a threshold finding of intent to mislead."  Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1439 (Fed. Cir. 1991).  Both materiality and culpable conduct are questions of fact, and "each must be proved by clear and convincing evidence."  Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113, 1122 (Fed. Cir. 1998).  Assuming satisfaction of both thresholds, the court balances materiality and intent to determine whether the applicant's conduct is so culpable that the patent should be held to be unenforceable; the "more material the omission, the less culpable the intent required, and

vice versa." Halliburton, 925 F.2d at 1439.

1.  Materiality

O2 Micro contends that the Cosby/Nelms article was highly material and that it clearly anticipated and/or rendered obvious the asserted claims of the '814 and '881 patents.  MPS argues that the article was not material, correctly noting that inventors have no obligation to disclose otherwise material references if that information is cumulative or less material than references already before the patent examiner.  Halliburton, 925 F.2d at 1440.  MPS further asserts that the Cosby/Nelms article fails to disclose several elements required to qualify as anticipating prior art.

In determining materiality, courts "have consistently referred to the definition provided in 37 C.F.R. § 1.56." Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1352 (Fed. Cir. 2005).  Title 37 C.F.R. section 1.56 provides that:

> information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case[6] of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:

---

[6]"A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability."  37 C.F.R. § 1.56.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1         (i)   Opposing an argument of unpatentability relied
2             on by the Office, or

3         (ii)  Asserting an argument of patentability.

4  Materiality of a reference is analyzed, not in a vacuum, but upon

5  the overall degree of similarity between the omitted reference and

6  the claimed invention in light of other prior art before the

7  examiner.  <u>Baxter Int'l, Inc. v. McGaw, Inc.</u>, 149 F.3d 1321, 1328

8  (Fed. Cir. 1998).

9       O2 Micro argues that it established at trial a <u>prima facie</u>

10 case of unpatentability of both patents based on the Cosby/Nelms

11 article, which it notes was published more than four years before

12 the application for the '814 patent, and thus that the article is

13 highly material.  To support this argument, O2 Micro points to

14

15 Dr. Erickson's testimony that every element of claim 1[7] of the

16 ───────────────

17     [7]Claim 1 reads as follows:

18   An apparatus for efficiently converting a direct current
     (DC) signal into an alternating current (AC) signal for
19   driving a load, comprising:

20   (a) an H-bridge network of a plurality of switches for
        generating an AC signal from a DC signal coupled to
21      the network of the plurality of switches, the AC
        signal being generated by a first portion of the
22      network of the plurality of switches periodically
        opening and closing opposite to the periodic
23      opening and closing of a second portion of the
        network of the plurality of switches, said first
24      portion of the network being diagonally opposed to
        said second portion of the network;

25   (b) a tank circuit being coupled between the network of
        the plurality of switches and the load, the tank
26      circuit filtering the AC signal delivered to the
        load; and
27

28                  31

'881 patent and claim 10[8] of the '814 patent was disclosed by the

       (c) a controller for periodically opening and
           closing portions of the network of the plurality of
           switches based on a resonant frequency of the tank
           circuit, so that the optimal amount of electrical
           power is provided for driving the load under a
           range of voltages provided by the DC signal.

[8]Claim 10 reads as follows:

    The apparatus of claim 8, wherein the opposite waveforms
    for each power phase have a symmetrical shape so that
    the formation of a harmonic signal in the AC signal is
    suppressed.

Claim 8 reads as follows:

    Apparatus for efficiently converting a direct current (DC)
    signal into an alternating current (AC) signal for driving
    a load, comprising:

      (a) a network of a plurality of switches for generating
         an AC signal from a DC signal coupled to the
         network of the plurality of switches, the AC signal
         being generated by a portion of the network of the
         plurality of switches periodically opening and
         closing opposite to the periodic opening and
         closing of another portion of the network of the
         plurality of switches;

      (b) a tank circuit being coupled between the network of
         the plurality of switches and the load, the tank
         circuit filtering the AC signal delivered to the
         load; and

      (c) a controller for periodically opening and closing
         portions of the network of the plurality of
         switches based on a resonant frequency of the tank
         circuit, so that the optimal amount of electrical
         power is provided for driving the load under a
         range of voltages provided by the DC signal,
         wherein the periodic opening and closing of
         portions of the network of the plurality of
         switches is based on a resonant frequency of the
         tank circuit, further comprising a power phase for
         the portion of the network of the plurality of
         switches and another power phase for the other
         portion of the network of the plurality of
         switches, so that each power phase generates an
         opposite waveform of the AC signal used to drive

United States District Court

For the Northern District of California

32

Cosby/Nelms article.  Trial Tr. 949-69, 1905-6.  O2 Micro correctly notes that inequitable conduct with respect to one claim renders the entire patent unenforceable.  <u>Baxter</u>, 149 F.3d at 1332.

MPS responds by detailing the elements of the asserted claims that the Cosby/Nelms article purportedly does not address, <u>i.e.</u>, optimal power, range of DC voltages and operation of a full-bridge circuit.

First, MPS asserts that nothing in the article discusses the concept of "optimal power," nor how to achieve it, noting that all of the claims of the patents require that the optimal amount of electrical power is provided for driving the load.  <u>See</u> '814 patent at 30:1-3 (claims 8 and 10); '881 patent at 28:2-3 (claim 1).  To maintain "optimal power" to the CCFL, some method of regulation or power feedback circuitry is required.  Bench Trial Tr. at 21:24-22:7.  But according to the testimony offered by Professor Nelms, co-author of the article, the circuit that he described in his article lacked the necessary regulation or power feedback circuitry: the circuit did not have any feedback mechanism to vary the brightness or maintain a consistent brightness once the cathode fluorescent light was turned on.  Trial Tr. 1442:8-25.  Professor Nelms testified that his article did not discuss any type of

the load.

United States District Court

For the Northern District of California

feedback circuitry.  Id. at 1444:1-5.  And even O2 Micro's expert Dr. Erickson stated that the article "mention[ed] a control chip" that had "circuitry for building a feedback loop included.  But [the article] gives no more detail -- you know, no details about what [it] was."  Id. at 1041:10-23.

O2 Micro replies that the Cosby/Nelms article does disclose optimal power, arguing that the trial record shows that the article discloses a controller that opens and closes the switches so that the optimal amount of electrical power is provided for driving the load under a range of voltages provided by the DC signal.  The trial record cited includes the Cosby/Nelms article and testimony by Dr. Erickson, O2 Micro's expert.  Dr. Erickson testified that the controller discussed in the Cosby/Nelms article had feedback circuitry "where it can sense what the output is, like the output voltage of the output current and then adjust the switching to maintain the output to be a desired level."  Trial Tr. 956:15-957:13.  O2 Micro notes that the article need not use the same words used in the MPS patents to support anticipation, or materiality.  But the testimony of Dr. Erickson cited by O2 Micro regarding feedback circuitry and "desired level" is not the same as this Court's definition of the term "the optimal amount of electrical power is provided for driving during the load."  The Court defined that term as "the least amount of electrical power that results in a regulated amount of current to drive the load at

the requested level of brightness."  November 26, 2001 Order

Construing Disputed Claims and Terms.  Dr. Erickson's testimony

does not address minimal power.  Nor does the article discuss the

least amount of power resulting in a regulated amount of current to

drive a load at the requested level of brightness.

The second point that MPS asserts is not disclosed in the

Cosby/Nelms article is a "range of DC voltages."  MPS notes that

all of the asserted claims require that optimal power be provided

over a range of direct current (DC) voltages.  As MPS points out,

there is no mention of a range of DC voltages in the Cosby/Nelms

article.  Professor Nelms testified that the direct current used by

the Cosby/Nelms circuit was fixed at a constant eighty-five volts

and that he did not vary the DC voltage or measure any variance in

the eighty-five volts.  Trial Tr. 1441:25-1442:8.

O2 Micro, however, replies that the article does disclose a

range of DC voltages and states that Dr. Erickson explained that

the DC source used in the article was derived from a 120 volt

utility line, which inherently varies between 108 and 132 volts.

But that is a misstatement of Dr. Erickson's testimony.  Rather, he

stated that "what you get from the utility is -- isn't always a

perfect 120 volt.  It has variation.  How much the variation is

depends on where you are in the world, but in the United States,

it's normally plus or minus ten percent."  Trial Tr. at 960:25-

961:4.  This testimony does not explain whether the variation in

United States District Court

For the Northern District of California

question, not disclosed in the article but allegedly inherent nonetheless, falls within this plus or minus ten percent.  And, as MPS correctly notes, Dr. Erickson's testimony is directly contradicted by Professor Nelms who stated that the variac he used in his laboratory did not vary by as much as plus or minus ten percent once it was set to a fixed voltage and that as far as he was aware the voltage did not vary.  Trial Tr. 1441:15-1442:5.

Third, MPS asserts that the Cosby/Nelms article mentions a full-bridge circuit only once and that the article does not contain any enabling disclosure of the operation of a full-bridge circuit, which is required for all claims.  Professor Nelms testified that, while the article listed full-bridge as one of the three topologies, they pursued only the half-bridge, and not the full-bridge or push-pull circuit.  Id. at 1440:2-15.  O2 Micro replies that it submitted evidence that the Cosby/Nelms article did disclose and enable a full-bridge and points to Dr. Erickson's testimony and illustration at trial.  Trial Tr. 952:24-955:14; Trial Ex. 5020.  O2 Micro also points to the illustration of a full-bridge in the Cosby thesis.  Trial. Ex. 3280.  The Cosby thesis, however, contains illustrations of the three possible inverter topologies: push-pull, full-bridge and half-bridge.  Id. at 4.  It states that, although "any of the above topologies could be made to work" with suitable design, "the half-bridge was chosen because the high power capabilities of the full-bridge were not

United States District Court

For the Northern District of California

needed, and a transformer is not needed as in the push-pull."   Id. at 5.   The Cosby/Nelms article teaches away from using a transformer.   Trial Ex. 69 at 424; Trial Tr. 1443:11-20.   The Court finds that the Cosby/Nelms article does not contain an enabling disclosure of a full-bridge circuit.

In addition, MPS correctly notes that, although the article discloses a square wave which O2 Micro states is a symmetrical wave form, the Cosby/Nelms article does not anticipate claim 10 of '814 patent because the claim element is more than just a symmetric signal.   Rather, it requires a full-bridge operating in power phases to generate opposite waveforms of a symmetric shape, which the Cosby/Nelms article does not discuss.

In addition to the fact that the Cosby/Nelms article does not address essential elements of the asserted claims, as discussed above, MPS further notes that the face page and file history of the '814 and '881 patents show that the examiner considered an extensive collection of prior art.   Specifically, the examiner considered five U.S. patent references and one non-patent reference for the '814 patent and over forty U.S. patent references and eleven non-patent references for the '881 patent.   The patents also disclosed prior art, including a half-bridge inverter circuit and a description of an inductive mode half-bridge (IMHB) circuit for driving a CCFL.   O2 Micro contends that this prior art of record, however, is not cumulative of, or more material than, the

37

Cosby/Nelms article.  It notes that John Shannon, one of the named inventors, testified that the disclosure of the IMHB circuit was not the same as the disclosure in the Cosby/Nelms article.  <u>See</u> Trial Tr. at 621:2-3, 636:15-17.  Mr. Shannon, however, also testified that the functionality of the Cosby/Nelms circuit and the IMHB circuit was the same and that the two circuits were "extremely similar."  Trial Tr. at 621:6-8, 636:14.  O2 Micro further contends that the Cosby/Nelms article discloses the use of a full-bridge, unlike the IMHB, which is a half-bridge circuit.  But, as discussed above, the Court finds that the Cosby/Nelms article does not contain an enabling disclosure of a full-bridge circuit.

O2 Micro provides evidence that the Cosby/Nelms article is material.  But materiality must be proven by clear and convincing evidence.  And in light of Professor Nelm's credible testimony explaining the article he co-authored, O2 Micro fails to provide such clear and convincing evidence.  Thus, the Court finds that the Cosby/Nelms article fails to satisfy the threshold level of materiality.  Nonetheless, the Court also considers whether there is clear and convincing evidence that MPS, and specifically Mr. Moyer, intended to deceive the PTO.

2.  Intent

O2 Micro argues that the Court should find that Mr. Moyer, a co-inventor of the patents, acted deliberately and with culpable intent in failing to disclose the Cosby/Nelms article to the patent

United States District Court

For the Northern District of California

examiner.  In a case such as this one, involving an omission of an arguably material reference to the patent examiner, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference.  <u>Baxter</u>, 149 F.3d at 1329.  O2 Micro correctly notes that because intent can rarely be proven by direct evidence, "intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information."  <u>Bruno Indep. Living</u>, 394 F.3d at 1354.  But a finding of deceptive intent cannot be based on mere negligence, even gross negligence.  <u>Halliburton</u>, 925 F.2d at 1442.  And "a mere showing that references having some degree of materiality were not disclosed does not establish inequitable conduct."  <u>Id.</u>  Instead, a finding of intent to deceive requires that there be conduct that, when viewed in light of all the evidence, including evidence indicative of good faith, indicates sufficient culpability.  <u>Hebert v. Lisle Corp.</u>, 99 F.3d 1109, 1116 (Fed. Cir. 1996).

In order to find such culpability, O2 Micro asks the Court to infer intent based on several facts.  First, O2 Micro states that Mr. Moyer had the article during the prosecution of the '814 and '881 patents.  But even that "fact" is based on inferences that are not clearly supported by the record.  The only fact clearly supported by the record is that Mr. Moyer had the first page of the article in his possession in the spring of 2001 when he handed a

folder of documents labeled "CCFL Patent" to his attorneys; in that folder was the first page of the Cosby/Nelms article.  Trial Exs. 4157, 5003.  O2 Micro wants the Court to infer that Mr. Moyer had the first page of the article during the '814 patent prosecution because most of the other documents in that folder relate to the '814 patent.  Trial Ex. 5033.  But also within the folder was a February 13, 2001 facsimile discussing document collection for this lawsuit and a copy of the '814 patent issued September 5, 2000.  <u>Id</u>.

O2 Micro contends that MPS' privilege log also shows that the front page of the article was in Mr. Moyer's patent prosecution folder during the '881 and '814 patent.  The first page of the Cosby/Nelms article originally appeared on MPS' privilege log as "First page of an article given to Jim Moyer by one of MPS' attorneys during prosecution of patent."  Trial Ex. 394, p.1.  But in an interrogatory, MPS stated that Mr. Moyer never said that the first page of the article was given to him by a lawyer; he merely said that he found it in the CCFL Patent folder and did not recognize it.  Trial Ex. 5007, p.8.  Because it was found with communications between MPS and its patent counsel, Mr. Moyer thought that "the first page of the Cosby article could have been given to him by one of MPS' patent prosecution attorneys, but that he did not actually remember from where he had obtained it."  <u>Id</u>.  MPS acknowledges that it made a mistake by including this page in its privilege log, and the Court does not find, as O2 Micro urges, that

**United States District Court**
For the Northern District of California

MPS is "judicially estopped" from admitting that it made a mistake. Mr. Moyer testified that he does not remember seeing the article prior to 2003, and he does not know how or when it came into his possession.  Bench Trial Tr. 16:17-23; 41:10-13.

Other facts O2 Micro lists as supporting a finding of intent to deceive are (1) that despite its purported high materiality, the article was not disclosed to the Patent Office; (2) that, as noted above, the first page was found in a folder labeled "CCFL Patent" where Mr. Moyer kept other documents from prosecution of the '814 patent, Bench Trial Tr. 9:3-24; (3) that once the front page of the Cosby/Nelms article was disclosed MPS attempted to obstruct and delay its discovery by labeling it a privileged document; and (4) that Mr. Moyer now "conveniently" can't recall the underlying events relating to the first page of the Cosby/Nelms article.

Even assuming that Mr. Moyer had the article in his folder during the prosecution of both patents, that fact does not provide clear and convincing evidence of intent to deceive.  At most it illustrates gross negligence on the part of Mr. Moyer and MPS, and the Court will not infer a higher level of culpability.  See Baxter, 149 F.3d at 1329 ("mere gross negligence is insufficient to justify an inference of an intent to deceive the PTO").  Nor, as MPS correctly notes, does the alleged materiality of information itself provide clear and convincing evidence of intent to deceive.  See Halliburton, 925 F.2d at 1440 (intent cannot be presumed from a

United States District Court

For the Northern District of California

showing of materiality).  Furthermore, MPS correctly notes that evidence indicative of good faith must be considered when determining intent to deceive.  Mr. Moyer testified that if he placed himself back at the time of the prosecution of the patents, he would not have disclosed the Cosby/Nelms article to the PTO because he believes it is cumulative of other references and of the inductive mode half bridge device the inventors cited as prior art in their patent application.  Bench Trial Tr. 41:20-42:6.  That testimony, in light of his testimony regarding what he perceived to be the differences between the patents and the Cosby/Nelms article and what information was already disclosed in other references before the patent examiner, is credible and reasonable.

Even accepting all of O2 Micro's inferences as fact, the Court finds that it has failed to present clear and convincing evidence that Mr. Moyer formed a culpable intent to withhold the Cosby/Nelms article from the patent examiner during the prosecution of either patent.

3.  Balancing

Because O2 Micro fails to present clear and convincing evidence to meet the threshold for materiality or for intent to deceive, no balancing of materiality and intent can be undertaken to "determine whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct."  Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1359 (Fed. Cir. 2003).

42

In sum, the Court concludes that O2 Micro has failed to meet its burden to provide clear and convincing evidence that the Cosby/Nelms article meets the threshold of materiality or intent to deceive.

B.   Exceptional Case and Attorneys' Fees

O2 Micro argues that it should be awarded reasonable attorneys' fees under Title 35 U.S.C. section 285, which provides that in exceptional patent cases courts "may award reasonable attorney fees to the prevailing party."  This attorneys' fees request is in addition to O2 Micro's request for attorneys' fees under the California UTSA.  Its argument that this is an exceptional case is largely based upon the alleged inequitable conduct of MPS.  However, the Court does not find that MPS engaged in inequitable conduct.

O2 Micro further argues that MPS' misconduct during the litigation, by itself, may warrant a finding that this is an exceptional case.  But the cases O2 Micro cites do not support that argument.  In A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1313 (Fed. Cir. 1988), the court ruled that the district court needed to decide whether the party engaged in inequitable conduct before it denied exceptional case status and hence attorneys' fees to the moving party.  In Cambridge Products, Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050-51 (Fed. Cir. 1992), the court found that the exceptional nature of the case must be established by clear and convincing evidence, explaining that "exceptional cases" are

United States District Court
For the Northern District of California

normally those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent.  Like the moving party in <u>Cambridge Products</u>, O2 Micro fails to establish by clear and convincing evidence that this is an exceptional case under section 285 or that MPS pursued this litigation in bad faith. <u>Id</u>. at 1051.  Thus, the Court finds that this is not an exceptional case under section 285 and does not award attorneys' fees.

 C. MPS' Motion Regarding Advisory Jury Verdict

 MPS argues that, based on a recent Federal Circuit case, the Court should treat the jury verdict regarding the patent issues as advisory.  <u>See</u> <u>In re Technology Licensing Corp.</u>, 423 F.3d 1286 (Fed. Cir. 2005) (holding that a patentee seeking only injunctive relief on its infringement counterclaim has no right to a jury trial, regardless of whether the accused infringer asserts invalidity as a defense).  That case, however, does not give this Court the power to transform a jury verdict into an advisory finding after the verdict is returned.  The Ninth Circuit has not addressed precisely this issue.  But, as stated by the Sixth Circuit,

> The parties are entitled to know prior to trial whether the jury or the court will be the trier of fact. <u>Pradier v. Elespuru</u>, 641 F.2d 808, 811 (9th Cir. 1981). This conclusion follows from the language of Rule 39(c), which permits the district court to try a case "with an advisory jury," not to have the case tried by a jury and essentially exercise a veto power.

United States District Court

For the Northern District of California

Thompson v. Parkes, 963 F.2d 885, 890 (6th Cir. 1992).[9]

Furthermore, O2 Micro correctly notes that the circumstances of this case are distinguishable from In re Technology Licensing Corp., where the patentee voluntarily and permanently abandoned its damages claim after an adverse court ruling that dramatically limited its damages.  Here, like in In re Lockwood, 50 F.3d 966 (Fed. Cir. 1995), vacated on other grounds, 515 U.S. 1182 (1995),[10] MPS, the patentee, did not elect to limit itself to an equitable remedy. Unlike the patentee in In re Technology Corp., MPS did not forfeit its "right to a jury trial by taking any steps that would have required" it, historically, to file its case in equity.  423 F.3d at 1289.  Rather, the Court ruled that MPS lacked evidence of damages and granted O2 Micro's motion for summary adjudication on that issue.

The Court will not and cannot treat the jury's verdict regarding the patent issues as advisory.

[9]Federal Rule of Civil Procedure 39(c) provides,
In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, except in actions against the United States when a statute of the United States provides for trial without a jury, the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

[10]Although Lockwood was vacated, the Federal Circuit continues to find its reasoning pertinent.  Tegal Corp. v. Tokyo Electron Am., Inc., 257 F.3d 1331, 1340 (Fed. Cir. 2001).

45

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONCLUSION

For the foregoing reasons, the Court DENIES O2 Micro's request for injunctive relief (Docket Nos. 1166 [Public Version], 1167 [Filed Under Seal]).[11]  The Court DENIES in part and GRANTS in part MPS' motion for judgment as a matter of law (Docket No. 1163).  The Court GRANTS judgment as a matter of law that the award of unjust enrichment damages was not based on evidence presented at trial, but DENIES judgment as a matter of law that O2 Micro failed to prove use of Trade Secrets 1, 8, 9, 10 and 11.  The Court GRANTS O2 Micro's request for a reasonable royalty and exemplary damages, but DENIES O2 Micro's request for attorneys' fees under the UTSA (Docket Nos. 1166 [Public Version], 1167 [Filed Under Seal]).  The Court finds and concludes that O2 Micro failed to show by clear and convincing evidence that MPS engaged in inequitable conduct.  The Court further finds that this is not an exceptional patent case and

_____

[11]The Court also DENIES as moot O2 Micro's Motion to Strike Portions of MPS' Opposition to O2 Micro's Post-Trial Brief on Equitable Issue and the Declarations of Steven Baik and Dalson Wu in Support of Same (Docket No. 1188).  The Court did not rely on the declaration of Dalson Wu, paragraph twenty-two of Mr. Baik's declaration regarding the alleged "expert testimony," paragraph twenty-three of Mr. Baik's declaration regarding mistakenly listing the first page of the Cosby/Nelms article on the privilege log, Mr. Moyer's deposition testimony or Dr. Brockhurt's supplemental rebuttal expert report.  The Court did not consider the attorneys' arguments as evidence.  Thus, the Court will not strike MPS' attorneys' arguments regarding inequitable conduct or MPS' attorneys' arguments that are contrary to the jury verdict.
    Furthermore, to the extent that the Court relies upon evidence presented by O2 Micro in its proposed findings of fact and conclusions of law, MPS' objections are overruled.  To the extent the Court does not rely on such evidence, MPS' objections are moot.

1  thus DENIES attorneys' fees under Title 35 U.S.C. section 285.  The

2  Court DENIES MPS' motion requesting that, as to the patent issues,

3  the jury verdict be treated as advisory (Docket No. 1215).

4       IT IS SO ORDERED.

5

6

7  Dated:  11/10/05

8  

9  _____
   CLAUDIA WILKEN
   United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

O2 Micro Intl.,

Case Number: CV00-04071 CW

          Plaintiff,

**CERTIFICATE OF SERVICE**

  v.

Monolithic Power,

          Defendant.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 10, 2005, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Charlene M. Morrow

Fenwick & West LLP

801 California Street

Mountain View,  CA 94041-2008

Daniel  Johnson

Morgan Lewis & Bockius LLP

One Market St.

Spear Street Tower

San Francisco,  CA 94105-1126

48

Duane H. Mathiowetz

Howrey Simon Arnold & White LLP

525 Market Street

Suite 3600

San Francisco,  CA 94105-2708


Michael Barclay

Wilson Sonsini Goodrich & Rosati

650 Page Mill Road

Palo Alto,  CA 94304-1050


Dated: November 10, 2005

Richard W. Wieking, Clerk

By: Sheilah Cahill, Deputy Clerk

**United States District Court**

For the Northern District of California